Hymann *agt.* Cook and others.

*Not reported.*

———◄•••►———

HYMANN, plaintiff in error *agt.* COOK AND OTHERS, defendants in error.

## Questions discussed.

1. Whether, where a matter of *fact,* pleaded by defendants in error, in the supreme court, in bar of the plaintiff's right to maintain his writ of error, being found for the plaintiff, the defendants in error, notwithstanding there was no joinder in error, had a right to be heard upon the whole matter on the record?

2. Whether *replevin* for wrongful *taking* would lie, where the property, nine casks horn-tips, purchased and paid for by plaintiff, with a request by defendants to take them away, which was objected to by plaintiff until counted, and during their continuance in the store of defendants, while plaintiff was counting the same, he was forbidden by defendants from taking them away? In other words, was the evidence in the case sufficient to sustain the action of replevin in the *cepit?*

3. Whether, in a non-suit in replevin, on the ground that the proof did not show a wrongful *taking,* but at most only a wrongful detention; and the defendants having *once elected* to take an *assessment of damages* under the statute, they could afterward, and before the jury were discharged, waive the assessment, and take judgment for a *return of the property?*

Hymann *agt.* Cook and others.

This was an action of *replevin*, brought by Hymann against Cook, Arms & Perkins, in the New-York common pleas.    The declaration " complains that the said defendants heretofore, and before the commencement of this suit, to wit, on the tenth day of August, one thousand eight hundred and thirty-nine, at the city and county of New-York aforesaid, and within the jurisdiction of this court, in a certain house or store, to wit, at No. 138 Pearl-street, in the city of New-York, took nine casks horn-tips, containing a large quantity, to wit, 32,500 horn-tips, the property of the said plaintiff, of great value, to wit, of the value of five hundred dollars, and the said defendants unjustly detained the same, wherefore the said plaintiff says he is injured and has sustained damages of two hundred and fifty dollars."

To this the defendants pleaded, 1st. The general issue; 2nd. A special plea that the property was in the said defendants, Levi Cook, Charles Arms, and one Moses Cook; 3rd. A special plea that the property was in the said Levi Cook and Charles Arms; and 4th. A special plea that the property was in the said defendants.

The cause was tried before his Hon. WILLIAM INGLIS, associate judge of the New-York common pleas, on the 10th day of April, 1840.    The plaintiff introduced the following testimony:

*Hymann Jacob* being duly sworn, *de bene esse,* as a witness on the part of the plaintiff in this cause, answers as follows.    He says he expects to leave for Connecticut in a day or two, to return in about two months.

*Ques.* Do you know Samuel Hymann, plaintiff in this cause?
*Ans.* Yes, sir.

*Q.* Do you know the defendants, Cook, Arms, and Perkins, or either, and which of them?

*A.* Yes, sir.    I saw them twice.

*Q.* When and where did you see them?

*A.* I saw them once on a Saturday, and once on a Tuesday, in their store in Pearl-street—I don't know the number—between Coenties Slip and Wall-street; it was about five months ago.

Hymann *agt.* Cook and others.

*Q.* What business did you see them about?

*A.* When we first bought the goods, I went there to count them. Bought horn-tips. My father went round to buy some goods to send to Germany. He could not get any, and we went in there, and they said they had some; he could not agree about the price; he said he'd go home, and get back in about an hour's time. I went along with him, and wanted to see what kind of goods they were; we bought them, and gave them $50 on account.

*Q.* Did the defendants, or either of them, give you any receipt or bill of sale for the goods bought?

*A.* They gave us a paper [the paper was produced] marked A, is the paper they gave us.

*Q.* What goods was it you bought?

*A.* Horn-tips.

*Q.* Who did you buy them for?

*A.* Samuel Hymann, my cousin.

*Q.* Where was Samuel Hymann at the time?

*A.* In the country; I don't know what part.

*Q.* What did you do next, after they had given you this paper?

*A.* We told them we would come back next week, but did not tell them what day.

*Q.* Did you ever see the horn-tips?

*A.* Yes, sir, I saw them; first saw them when we bought them; there were nine casks; they were in the lowest part of the store.

*Q.* When did you go to Levi Cook & Co.'s store next?

*A.* On the Tuesday next after the Saturday just spoken of.

*Q.* What was your object in going to their store?

*A.* We bought three casks—to count the tips and take them away.

*Q.* Was your father with you?

*A.* No, sir; he was there with me some part of the day.

*Q.* Did you and your father count the tips?

*A.* Yes, part of them.

*Q.* What part of the store were they in on Tuesday?

Hymann *agt.* Cook and others.

*A.* In the same part of the store in which they were bought of them.

*Q.* Did any one in the store tell you to count them?

*A.* Yes, sir; they said I should count them and try to take them away as soon as I could, as they had no room for them.

*Q.* Why did you only count part of the tips?

*A.* There were some good ones, and there were some short. My father and myself went up and told them there were 1,800 short. We went down again, and commenced counting the bad ones. About one hour's time after that, one of the clerks came down and asked my father what kind of money he had given him. My father told him it was gold, silver, and bills. He (the clerk) said he had made a mistake of $100. He would not let us count them any further.

### Cross-examined by *Mr. O'Conor.*

*Q.* What is your father's name?

*A.* Moses Jacob Polander.

*Q.* What is his business?

*A.* He keeps a stand in Chatham Square, near Mr. Brown's house, where he sells pins, needles, and such small things.

*Q.* Who was it in Germany to whom he would send things?

*A.* I don't know.

*Q.* Was it horn-tips he wished to purchase to send to Germany?

*A.* Yes, sir, horn-tips.

*Q.* What is Samuel Hymann's business?

*A.* He peddles about the country.

*Q.* In what degree is he related to you?

*A.* He is son of my mother's brother.

*Q.* How long before this purchase had you seen him for the last time?

*A.* About two months.

*Q.* How soon after the purchase did you next see him?

*A.* About two months.

*Q.* Who did you speak to at the store of Levi Cook & Co. when you made the purchase?

*A.* One of the clerks. We made the purchase from one of the clerks.

*Q.* Do you know his name?

*A.* No, sir.

*Q.* Did you see this bill written up, and the receipt at the foot of it signed?

*A.* Yes, sir.

*Q.* Who was it wrote and signed the bill and receipt?

*A.* The same clerk that we bought the horn-tips from.

*Q.* Did you or your father speak to any one else in the store about the goods at the time the goods were purchased and the bill and receipt given?

*A.* No, sir.

*Q.* Did you go there on Tuesday with your father?

*A.* No. I went first alone, and asked the same clerk if I could get at the casks, to count the tips and take them away.

*Q.* How did you set about counting them?

*A.* We emptied the casks upon the floor, counted all the tips back into it, and then did the same with the next cask, and so on.

*Q.* How many casks did you empty and count in this way?

*A.* Four or five; we counted all the good ones. I believe there were six casks of good ones, and three casks of bad ones; we bought them as such.

*Q.* Who was the clerk who came down and spoke to you while you were counting, as you have said?

*A.* The one we bought them from.

*Q.* When you were first there, and when you bought the goods, did your father tell the clerk what his name was?

*A.* No, sir. I did not hear him. [After reflection, the witness says " yes," he did tell him; he told the clerk his name was Moses Jacob Polander. This was when the clerk was making out the bill.]

*Q.* Did the clerk put your father's name in the bill?

*A.* I can't tell you. I did not see him.

*Q.* Can you read?

*A.* No, sir.

*Q.* Do you know whose name was put in the bill?

*A.* No, sir.

*Q.* When the clerk asked your father his name, for the purpose of making out the bill, what did your father say?

*A.* My father said Samuel Hymann.

*Q.* Can your father read?

*A.* No, sir.

*Q.* Did you ever see Levi Cook?

*A.* Yes, sir; I saw him on that Tuesday for the first and last time.

*Q.* Did you ever see Charles Arms?

*A.* I don't think I ever did. I don't know who he is. It is likely I did see him.

*Q.* Do you know the gentleman now present?

*A.* Yes, I think I have seen him before, but I don't know where; and I believe, if I did see him, I saw him in the store there.

*Q.* After the clerk spoke to your father about the money being short, did he ask your father to pay up the difference?

[Objected to.]

*A.* He did not say to make up the difference; he asked us to look in the receipt and see whether we gave him $260 or $160, and asked my father to show the receipt, if he had it there; my father replied that he had it not there; he looked for it, and found that he had it not there.

*Q.* After this, did your father leave immediately?

*A.* Yes, sir; he said it was no use to count any further, and we left immediately.

*Q.* Was it the casks or the tips of which six were said to belong to another person?

*A.* It was the casks, not the contents.

[Direct resumed.]

*Q.* Where did you see Samuel the last time before the purchase of the horn-tips?

*A.* In New-York.

*Q.* Where did you see him after the purchase?

*A.* In New-York.

[In answer to a question from defendant's counsel.]

*Q.* You said that the clerk asked your father his name, for the purpose of making out the bill, what did your father say?

*A.* That my father said Samuel Hymann.

*Q.* Do you mean that your father said that your father's own name was Samuel Hymann?

[Objected to as leading.]

*A.* No, sir; he meant that he bought the goods for him.

his

(Signed)      HYMANN ⋈ JACOBS.

Sworn to before me this 27th day of January, 1840.      mark.

    EDMUND S. DERRY,
       *Com'r of Deeds.*

We consent that this deposition be read on the trial of this cause with the like effect as if it had been taken *de bene esse,* pursuant to the statute, necessity of filing being waived. New-York, January 27, 1840.

    E. S. DERRY, *for Def't.*

    P. J. JOACHIMSSEN, *for Pl'ff.*

The counsel for the plaintiff then read in evidence to the court and jury a bill of sale in the words following, to wit:

New-York, August 3, 1839.

MR. SAMUEL HYMANN,

Bought of LEVI, COOK & Co.,

Manufacturers of every description of Combs, and importers of English, French, and German Fancy Goods, No. 138 Pearl-street and 104 Water-street,

9 casks horn-tips . . . . . . . . . . $260
Received on account . . . . . . . . . . $50

LEVI COOK & Co.
G. PERKINS.

Which is the same bill or paper referred to by the witness in his deposition.

On further cross-examination the witness identified the person of defendant Perkins then in court. The counsel for plain-

tiff then further called as a witness, on the part of the plaintiff, *Moses Jacob Polander*, who, being duly sworn, testified that he knew the plaintiff, who is the son of witness's brother-in-law.   Has traded with the defendants, Levi Cook & Co., for plaintiff, in once buying horn-tips; this was about six or seven months ago.   Witness made the bargain, and was to pay $260 for them.   Paid for them at one time $50, and the balance, $210, at another time.   When he paid the last mentioned instalment, the clerks counted the money, and then said it was $10 short.   Witness then paid them $10.   There was also a deficiency on two sovereigns, which witness also paid: the clerk (Perkins) then gave him a receipt, and told him he should take away the goods.   Witness replied that he could not take them away until he had counted them.   Witness and his son (the witness Jacob) went down to defendant's store to count them; was there all day Tuesday, and found, on partly counting them, that there were 1,800 less tips of one kind than the number agreed to be sold to him.   This was some time in the afternoon, and witness and son went up and told the clerk so, and returned to count those of the other kind; while counting these, the clerk who gave the receipt came to them and asked him what kind of money he had given to him—whether he had the receipt with him.   The clerk said he had not paid him full $260, but only $160.   He said we must stop counting, that he would not allow us to take away the tips.   This is the receipt: witness identified a paper which was read in evidence, and is as follows:

Received, New-York, August 5, 1839, of Mr. Samuel Hymann, two hundred and ten dollars, in full for bill tips.

$210
 50 R. O.                                    L. Cook & Co.
————                                              Perkins.
$260

The casks had been pointed out to witness, and he had been requested to take the tips away on the day previous.   Afterward and while counting them, the defendants would not let him take away the tips.   He did not get the tips until replevied.

The plaintiff's counsel here rested his case. The defendants' counsel moved for a non-suit, on the ground that the declaration was for a wrongful taking only, and not for a wrongful detention, and that the evidence did not show a wrongful taking. The court decided that there was no evidence of a wrongful taking, but at most only of a wrongful detention of the goods, and ordered a non-suit to be entered,—to which decision the counsel for the plaintiff, on the behalf of the plaintiff, then and there excepted.

A non-suit was then ordered, and the defendants' counsel stated that he would take an assessment of damages under the statute. The court then took a recess. On the opening of the court, the counsel for the defendants stated to the court that he would waive the assessment of damages, and take a judgment *de retorno habendo.* The counsel for the plaintiff objected on the ground that the defendants had elected an assessment of damages, that the jury had remained empaneled, and that the defendants had thereby waived and precluded themselves from such judgment. The court overruled the objection. The plaintiff's counsel excepted to the decision, and insisted that the defendants were bound to take a judgment for damages which were to be assessed by the jury then empaneled. The court noted the exception, and decided that the defendants were entitled to a judgment of return, and ordered the jury to assess the value of the property. The plaintiff's counsel excepted. The jury, under the direction of the court, assessed the value of the property replevied at two hundred and sixty dollars.

The plaintiff brought a writ of error to the supreme court, and assigned errors generally, and specially as to judgment of a return of the property.

The defendants pleaded specially that the writ of error was not brought within two years after the rendition of the judgment.

The plaintiff replied, that on the day and year of the rendition of the judgment, he was an infant, of the age of nineteen years and three months only, and that he brought his writ of error

within two years next after he arrived at the age of twenty-one years.

The defendants rejoined to the replication denying the infancy of the plaintiff, and concluded to the country, &c.

The issue of fact thus joined was tried before the Hon. John W. Edmonds, circuit judge, and a jury, on the 7th January, 1845, who found that the plaintiff was an infant on the day of the rendition of the judgment, and that he brought his writ of error within two years after arriving at the age of twenty-one years.

At the February special term, 1846, A. Taber, for the plaintiff in error, pursuant to notice, upon the *trial record*, consisting of the papers which would make the usual error book, and the *postea* and circuit minutes, moved for a rule reversing the judgment of the common pleas, and alleged that it was a matter of course.

The motion was opposed by N. Hill, Jr., for defendants in error.

Upon that motion, Bronson, Ch. J., delivered an opinion, (*Reported* 2 *Denio*, 201,) and *held*, that the finding of the issue of fact in favor of the plaintiff in error, proved the plaintiff in error was not barred of his writ of error. But it did not prove that there was any error in the judgment. "The most that could be said of the matter was, that by pleading in bar the defendants had impliedly admitted that there was error in the judgment. But although the parties might conclude themselves by admissions, they could not bind the court. The defendants might confess error in fact, and the court would act upon it; but it was not so where they confessed error in law. There the court would judge for itself." After citing authorities to show that the court must look into the record, the judge concluded as follows: "We must look into this record just as we should have done had there been a joinder in error, instead of a plea in bar. (*See Acker* v. *Ledyard*, 1 *Denio*, 677.) The proper course will be for the plaintiff to make up error books and place the cause on the calendar for argument. Either party can notice it. And should a like case arise in

Hymann *agt.* Cook and others.

future, the same course must be pursued, instead of making a non-enumerated motion, as has been done in this instance."

In October term, 1846, the supreme court affirmed the judgment of the common pleas upon the whole record, and ordered execution for a return of the property to the defendants.

The plaintiff, Hymann, brought a writ of error, and assigned errors generally, and removed the judgment into this court.

*P. J. Joachimssen, Attorney* and *Counsel* for plaintiff in error.

*First.* The judgment of the supreme court ought to be reversed, because :

1. There is no judgment whatever upon the issue of fact found in the supreme court for the plaintiff in error.

2. The supreme court upon the issue in that court found for the plaintiff in error, ought to have given judgment according to the finding of the jury upon the matter of fact.

3. The supreme court, upon the pleadings in error and verdict, were bound to reverse the judgment of the New-York common pleas. (*Cunningham* v. *Houston,* 1 *Strange,* 127; *Davenant* v. *Rafter,* 2 *Ld. Raym.,* 1047 ; 2 *Tidd's Practice,* 1121; 1 *Arch. Prac.* 256, *ed.* 1827; *Acker* v. *Ledyard,* 1 *Denio,* 677; 2 *R. S.* 499, (601,) § 62; 1 *Ld. Raym.* 1047, 1005 ; 1 *Salk.* 267, *S. C.; 3 do.* 399, *S. C.* ; 6 *Mod.* 206, 113 ; *Holt.* 275.)

*Second.* The judgment of the common pleas ought to have been reversed, because :

1. The non-suit was erroneous. The plaintiff sufficiently proved :

(1.) Title to the property replevied.

(2.) Possession. (*Shindler* v. *Houston,* 1 *Denio,* 51.)

(3.) An unlawful exercise of dominion over his property by the defendants, which constitutes a "taking." (*Craig* v. *Smith,* 5 *Law Reporter,* 102 ; *Allen* v. *Crary,* 10 *Wend. R.* 349 ; *Root* v. *Chandler, id.* 110 ; *Wood* v. *Nixon, Addis. Rep.* 131.)

A wrongful detention is evidence of and constitutes a "taking." (*Evans* v. *Elliott and others,* 5 *Adol. & Ellis O. S.,* *p.* 142.)

☞ Every detention is a taking. ☜

---
Hymann *agt.* Cook and others.
---

2. After the election to take an assessment of damages the defendants could not require a judgment *de retorno habendo*. (2 *R. S.* 437, (530,) § 55.)

☞ REPLY.—We have to pay the costs of trying the issue on which we have succeeded.

Sale of casks in bulk—no particular quantity—no number. (23 *Wend.* 462.) ☜

*Benedict & Boardman, Attorneys, and*
*Charles O'Conor, Counsel,* for defendants in error.

*First.* The judgment of the court of common pleas was not erroneous.

1. The plaintiff below bought from the defendants below two lots of horn-tips, which the defendants below offered to deliver in bulk; but the plaintiff below refused to accept such delivery, and required the lots to be counted. Before the counting was completed, the defendants below retracted their offer, and declined to make the delivery. On this state of facts, the plaintiff's remedy was assumpsit on the agreement of sale. (*Chitty on Contracts,* 375, *note* 1, *and cases cited,* 5th *Am. ed., Springfield,* 1842; *Ward* v. *Shaw,* 7 *Wend.* 404; *Riddle* v. *Varnum,* 20 *Pick.* 280; 3 *N. H.* 457.)

☞ 5th *Ad. & El.* cannot be supported. But not necessary to say that. ☜

2. If the property in the goods passed to the plaintiff, still the defendants had never relinquished the possession of the goods; and their refusal to deliver was, at most, a mere *detention,* and not an unlawful taking. (*Gardner* v. *T——,* 15 *Johns. R.* 401; 20 *J. R.* 465; 2 *R. S.* 523, § 6 & 36; *Nichols* v. *Nichols,* 10 *Wend.* 630; 3 *R. S.,* 2d ed., *p.* 767; *Hale* v. *Clark,* 19 *Wend.* 498; 17 *J. R.* 116; 17 *Wend.* 58; *Barret* v. *Warren,* 3 *Hill,* 348; *id.* 282.)

*Second.* The judgment of the supreme court is not erroneous.

1. Although the matter of fact pleaded by the defendants in error in the supreme court, in bar of the plaintiff's right to maintain his writ of error, was found against them, yet they

Hymann *agt.* Cook and others.

had a right to be heard on the whole matter on the record; and, there being no error in the judgment of the common pleas, the supreme court was bound to affirm it. (*This case reported in* 2 *Denio,* 201, *and cases cited.*)

1. Judgment does not pass, as of course, upon a verdict in such case. The settled practice is otherwise. (*Brown* v. *Lerow,* 2 *Cow.* 525; 4 *id.* 17; 2 *Denio,* 201.)

2. In any ordinary suit, the defendant, after a regular default, or an unexceptionable verdict, may move in arrest, if upon the whole record it appears that the plaintiff is not entitled to judgment.

3. A default or verdict cannot establish more for the plaintiff than a general demurrer would; and yet a general demurrer is as good an answer to an assignment of errors in law as the common joinder.

4. It has long been settled law that, in a case like the present, the court must examine the whole record, and reverse or affirm, according to law, upon the *facts* therein stated.

5. An *express* admission upon the record of a matter of law would not bind the party making the admission; much less would it be proper to adjudge the law according to an admission merely *implied* from the defendant's failure to establish an independent fact on which he relied as an objection to the regularity of the suit. (7 *Wend.* 478; 4 *Cow.* 534, 94; 2 *do.* 36, 38, *note, form of assignment;* 2 *Caines,* 138.)

II. The infancy of the plaintiff in error appearing of record in the supreme court, is no ground of reversal.

1. The plaintiff was of age when he brought his writ; and he waived the complaint of *error in fact* by assigning merely error in law.

2. Had he, in replying the infancy, claimed that there was error on that ground, it would have been a clear case of departure in pleading—a total desertion of the case made by his assignment of errors.

3. If infancy was relied upon as *error in fact,* it should have been assigned; and then the defendants in error might have defended themselves in several modes.

(1.) By pleading a release of *that* error.

(2.) By procuring an amendment of the record, and showing that the plaintiff appeared in the court below by next friend.

(3.) By summary proceedings in the common pleas against the attorney who prosecuted the replevin, on which, perhaps, he would have been compelled to adjust, at his own cost, all difficulty resulting from *this error on his part.* (2 *R. S.* 446, § 2; 11 *Wend.* 166.)

☞ No such point made on the other side—from II. ☜

☞ *Case* 6 *Mod.* 206, *and in other books.* Though an actual error in fact is in effect error in record, want of original, &c., is specially assigned for error, and certiorari goes to certify instead of trial by jury. ☜

*Third.* The judgment of the supreme court should be affirmed.

JEWETT, Ch. J.    The plaintiff claims a reversal of the judgments below : 1st. On the ground that upon the pleadings in error and verdict upon the issue in fact found for the plaintiff, the supreme court was precluded from looking into the record, as there was no joinder in error, and was bound to give a judgment of reversal as a matter of course, whether there was error in law in the judgment of the common pleas or not, as that by the pleadings error in law was confessed.

A non-enumerated motion was made in this cause on the part of the *plaintiff* at a special term of the supreme court, (2 *Denio,* 201,) for a rule reversing the judgment of the common pleas, founded upon the papers which would make the usual error book and the postea and circuit minutes, when it was held that the court must look into the record just as it would have done had there been a joinder in error, instead of a plea in bar, and that a judgment would be given upon the same principles which would govern, if there had been a joinder in error, instead of a plea in bar ; subsequently error books were made and the cause brought to argument upon the calendar at a general term.

It was insisted on the argument by counsel for the plaintiff, that as the plea *in nullo est erratum* and the plea of the statute

of limitations were inconsistent, and could not be pleaded together, (*Acker* v. *Ledyard*, 1 *Denio*, 677,) the defendants in error, by pleading the statute, lost the benefit of the other plea; that when an issue in fact, joined upon the plea of the statute, was found for the plaintiff, the judgment, upon which error was brought, must be reversed of course, although by looking into the record of the judgment, the court could see that there was no error therein, as error therein was confessed by the pleadings.

That if the court, after such issue in fact had been found for the plaintiff, would still take notice of the record, so far as to see whether there was error in it or not, and render a judgment accordingly, as upon a plea of *in nullo est erratum*, it would involve the inconsistency of giving the defendants the benefit of both pleas indirectly, which they could not have directly.

I think the result of the authorities are, that the court ought not to give judgment of reversal, if there be no error in law, notwithstanding *in nullo est erratum* is not put in; and though it be true, that the defendants in error will then have the same advantage indirectly, as if they had pleaded that there was no error, which could not be permitted with the plea of the statute of limitations, the general rule is, that the court, *ex-officio*, must give the proper judgment, according to the right appearing upon the whole record. (*Dive* v. *Manningham*, *Plowden*, 66; *Carleton* v. *Martagh*, 6 *Mod.* 113, 206; *Meredith* v. *Danes*, 1 *Salk.* 270; *Rex* v. *Wilkes*, 3 *Burr* 2551; *Castledive* v. *Mundy*, 4 *Barn. & Ad.* 90; *Bret* v. *Papillon*, 4 *East.* 502; *Fraunee's case*, 8 *Coke*, 93 *A*; *Cunningham* v. *Houston*, 1 *Strange*, 127; *Davenant* v. *Rafter*, 2 *Ld. Raym.* 1046.)

2nd. That the judgment of the common pleas is erroneous, because the evidence given on the trial showed, or tended to show, a *wrongful taking* of the property replevied by the defendant.

At common law, replevin only lay to recover personal property, which had been *tortiously taken*, either originally or by construction of law, by some act which made the party a trespasser *ab initio*. A wrongful detainer, after a *lawful taking*,

28

is not equivalent to wrongful, original taking. (*Many'* v. *Head,* 1 *Mason R.* 319.) Where the taking was lawful, and the subsequent conversion was *wrongful, detinue* was the only remedy to recover the property *in specie.* They are both possessory actions; the former was governed by the principles applicable to trespass *de bonis asportatis,* the latter by those applicable to trover. (*Pangburn* v. *Patridge,* 7 *John.* 140; *Chapman* v. *Andrews,* 3 *Wend.* 240; *Rogers* v. *Arnold,* 12 *Wend.* 30.)

By 2 *R. S.* 553, § 15, the action of detinue was abolished, and the remedy by replevin was extended, so as to include cases of the wrongful *detention* as well as the wrongful *taking* of chattels. (2 *R. S.* 522, § 1.) But the distinction between *taking* and *detaining* is required to be maintained in the writ and declaration, and the plea differs both in its language and consequences in the two cases. (§§ 6, 36, 39, 40; *Nichols* v. *Nichols,* 10 *Wend.* 630.) In this case, the action being for a wrongful *taking,* it follows, if there was no evidence given tending to show the defendants chargeable with such act, the common pleas was right in non-suiting the plaintiff, although the evidence showed them chargeable with a wrongful *detention.*

Conceding that the contract for the purchase of the horn-tips was consummated, and that under it the title to the property passed to the plaintiff, as I think it must be, at least, for the purpose of determining the question made on the trial, the evidence showed that the plaintiff declined then to take away the goods, and left them in the possession of the defendants in their store to keep, until he could count and take them away during the following week, thus constituting the defendants his naked bailees for the safe keeping of the goods to be delivered to him at the place of deposit and time appointed, if required. In this situation the plaintiff called at the time and place appointed, and while in the act of counting, preparatory to securing and taking the property away, under the allegation, that in making the payment of the price of the goods, by some mistake it fell short by the sum of $100, Perkins refused to allow the plaintiffs to complete the count or take the goods away.

Now, unless this act of Perkins constituted a tortious *taking* by the defendants, or one of them, it is clear that trespass *de bonis asportatis*, or replevin in the *cepit*, could not be sustained. The defendants were lawfully holding the possession of the property at the time. Perkins refused to permit the plaintiff to take it away; and, of course, there had been no *taking*, up to that time. What followed, at most, was but a wrongful *detention ;* and having the possession of the goods as bailees, by the authority of the plaintiff, the defendants could not by any subsequent wrongful act, as by converting the same to their use, have made themselves trespassers *ab initio*, and therefore replevin for an unlawful *taking* could not be sustained. (*Hale* v. *Clarke*, 19 *Wend.* 498.)

But it was insisted by the plaintiff's counsel that a wrongful *detention* is evidence of, and constitutes a *taking ;* and the case of *Evans* v. *Elliott*, 5 *Adol. & Ellis*, 142, was referred to as sustaining the proposition. That was an action of replevin for taking and detaining certain cattle, &c., against J. Elliott, S. Elliott and T. Patrick. There was an avowry by the two Elliotts, and cognizance by Patrick, for rent due to the two Elliotts. Plea by the plaintiff that, after the taking of the cattle, &c., and before the impounding of the same, to wit, &c., the plaintiff tendered and offered to pay to Patrick, then being the bailiff of J. & S. Elliott, and by them duly authorized to receive the said rent, and make said distress, the said sum of, &c., so due for rent, as in the avowry, &c., mentioned, together with a certain sum of money, to wit, &c., for the costs and expenses of the taking the distress, the last said sum being reasonable and sufficient for the costs, &c., which several sums Patrick refused to accept, and afterward unjustly detained the said cattle, &c. There was a demurrer, assigning for causes that the plea did not sufficiently traverse, or confess, and avoid the matter in the avowry and cognizance, in this, that it is pleaded to the whole avowry and cognizance, and contains matter in answer only to part, the avowry and cognizance justifying the taking and detaining, and the plea not showing that the taking was not justified. There was a joinder. Lord DENMAN, C. J., said, "This is a very

critical objection; and it seems to me that the plea in bar is good enough. Every unlawful detention is a taking. It is said that the plea in bar distinguishes between the taking and the detention; and that the plaintiff might have pleaded that after the tender, the defendant again took and detained. But I do not see that, even as the plea stands, the taking complained of is *necessarily* confined to the taking *before* the tender.

"The cases show that the damages recovered would be only for such unlawful taking as would be shown to the jury."

LITTLEDALE, J., said, "I am entirely of the same opinion. The detention after the tender satisfies the declaration."

PATERSON, J., said, "The authorities cited by Mr. Williams show that replevin lies for detaining, and that is, as for a new taking."

The judgment of the court in that case proceeded upon the ground that it was competent for the plaintiff to plead to the avowry and cognizance, that after the tender the defendants again took and detained the distress, &c., and that as the plea stood it was not necessarily confined to the *taking before* the tender; and the remark that "every unlawful detention was a taking," was made in reference to an unlawful detention of a distress for rent, made under authority given the party by law, which unlawful act rendered the party a trespasser *ab initio;* in that sense the remark may be correct. But it has no application in this case. The counsel for the plaintiff on the argument insisted that any unlawful interference with the property of another, or exercise of dominion over it, by which the owner was damnified, was sufficient to maintain replevin for *taking*, or trespass *de bonis*, and *Allen* v. *Crary*, 10 *Wend.* 349, was referred to as an authority to sustain the principle. The principle, without any doubt, is true, and the authority is in point; but, as I think, neither the principle nor authority have any application here, as I understand the facts in the case. There the defendant who was sued in replevin in the *cepit* had pointed out the property in question, and directed the sheriff to levy on it (it being the property of Allen the plaintiff) on an execution in his (the defendant's) favor against one Rowan.

Hymann *agt.* Cook and others.

The court rightly held, that a sheriff is a trespasser who levies upon goods which are not the property of the defendant in the execution : he acts at his peril in such cases; his process only authorizes him to seize the defendant's property, and if the plaintiff in the execution direct the levy to be made, he is also a trespasser. The officer in such a case is his servant or agent, and trespass or replevin would lie against either of them. In this case the defendants neither took nor directed any other to take the property. The most they did was, to refuse to deliver the property to the plaintiff, having a lawful possession of it.

When the non-suit was ordered, the defendants being entitled to a return of the property, by their counsel stated that he would take an assessment of damages under the statute; but before any further step was taken in the cause, he stated to the court that he would waive the assessment of damages, and take a judgment for a return of the property. The plaintiff's counsel objected on the ground that the defendants had elected an assessment of damages, that the jury had remained impanneled, and that the defendants had thereby waived and precluded themselves from such judgment. The objection was overruled and an exception taken, upon which the jury assessed the value of the property.

It was a matter within the discretion of the court to allow the defendants to waive their election to have an assessment of damages and take judgment for a return, especially as nothing had been done under that election.

I think there is no error in the judgments of the courts below, and that the judgment of the supreme court should be affirmed.

BRONSON, J. As the issue of fact which was joined in the supreme court was found for the plaintiff, he insists that the judgment of the common pleas should have been reversed, whether there was any error in the record and proceedings or not. Another argument of the question has not changed, but has confirmed the opinion which I expressed when the case was before the supreme court on motion. (2 *Denio*, 201.) All the cases on which the plaintiff now relies were examined then, though some of them are not mentioned in the report. The verdict only settled that the plaintiff was not barred of his writ

of error, and left the question still open, whether in truth there was any error in the judgment of the common pleas. The distinction is between error in fact and error in law. When error in fact is assigned, and is found or adjudged in favor of the plaintiff, the judgment will be reversed; for though there may be no error in the record, it appears *dehors* the record, that there was error. But when error in law is assigned, if the defendant plead some matter in bar of the writ of error, as the statute of limitations or release, and the matter be found or adjudged against him, nothing appears beyond the fact that the plaintiff is not barred of his writ of error; and the court will look into the record to see whether in truth there be any error. If the matter pleaded in bar be found or adjudged in favor of the defendant, the court does not affirm the judgment, for it may be that there are errors in the record; the entry is, that the plaintiff take nothing by his writ of error. I do not now recollect any case where the judgment is either affirmed or reversed without looking into the record, except where judgment passes by default in the appellate court, and where error in fact is assigned and is found or adjudged in favor of the plaintiff.

The common pleas was right in holding, that at the most there was nothing but a wrongful detention of the goods, and that replevin in the *cepit* would not lie. It is clear upon the evidence that the property was never out of the possession of the vendors, and, consequently, that they could not have taken it from the plaintiff. It has been settled quite too long to allow it to be questioned now, that, at the common law, replevin will only lie where trespass might have been maintained; and although our statute authorizes the action for an unlawful detention, as well as for an unlawful taking, the distinction between the two cases is to be kept up in the writ and pleadings; (2 *R. S.* 522, § 1, 6, 36, 39, 40;) and in this, as well as in other cases, the plaintiff must prove his case as it is laid, or he cannot recover. There have been many instances where the plaintiff has failed in the action of replevin, because he had declared in the cepit instead of the detinet.

Hymann *agt.* Cook and others.

We are referred to a *dictum* of Lord DENMAN, C. J., in *Evans* v. *Elliott*, (5 *Ad. & El.* 142,) that every unlawful detention is a taking. But the case only decides that on a distress for rent, if the tenant tenders the rent, with costs, before the cattle are impounded, he may have replevin for the subsequent unlawful detentions. Whether this decision *can* be supported may admit of question. ( *See Gardner* v. *Campbell*, 15 *John.* 401; *Hall* v. *Clark*, 19 *Wend.* 498.) But it is enough for the present occasion to say that it was a case where a wrongful act had been done after distraining the goods; and so were all the cases which were cited in support of the decision. The doctrine that every unlawful detention is a taking, for which replevin in the cepit will lie, is not only *at war* with the distinction taken in our statute, but is in conflict with many adjudications.

But there is a still more serious difficulty in the plaintiff's way. The title to the property never passed out of the vendors. Although the witnesses and the bill of parcels speak of the sale of nine casks of horn-tips, it cannot be denied, upon the evidence, that it was a sale of some specified quantity of tips, which quantity was to be ascertained by counting. The vendors requested the plaintiff to count and take them away as soon as he could, as they had no room for them; and the plaintiff said he could not take them away until he had counted them. The counting was commenced, and it progressed until it had been ascertained that there were 1800 less tips of one kind *than the number agreed to be sold.* I need not refer to cases to prove that so long as any thing remains to be done between the parties, as weighing, measuring, counting, or the like, the title to the goods has not passed, but is still in the vendor. It is impossible to maintain that the plaintiff was bound to accept what tips might be found in the nine casks, although the quantity was deficient; and he never proposed or offered to accept any less than the quantity for which he had agreed. If the vendors were in fault, the plaintiff has a remedy; but he cannot maintain replevin.

I see nothing in the other questions made by the plaintiff

which calls for a remark; and am of opinion that the judgment of the supreme court should be affirmed. Judgment affirmed.

WRIGHT, J. This was an action of replevin in the *cepit*, and on the trial in the common pleas the judge non-suited the plaintiff on the ground that there was no evidence of a *wrongful taking;* but at most, only of a *wrongful detention* of the goods. It is admitted, that if the plaintiff gave any evidence of a tortious taking, however slight, the case should have been submitted to the jury.

The action being in the *cepit*, there can be no doubt that if the defendants lawfully acquired the possession of the goods, the plaintiff must fail; although it is not clear that had it been in the *detinet*, it might not have been sustained by showing a tortious taking only. The important question, therefore, in the case, is, whether there was any evidence of a wrongful taking by the defendants. The solution of this question depends upon several inquiries. 1st. Did the evidence offered show the general property of the goods to be in the plaintiff? 2nd. Had there been an actual or constructive delivery of them to him, and was he in actual or constructive possession? 3rd. Was there, on the part of the defendants, such an interference with or unlawful exercise of dominion over the property as to constitute them trespassers? It is an established principle that replevin in the *cepit* will only lie where trespass might have been brought; but in my view, if the two first inquiries are satisfactorily solved for the plaintiff, there will be little difficulty in determining the latter in his favor. In cases of tortious taking, trover, trespass *de bonis asportatis* and replevin, are concurrent remedies; and the same interference with a man's goods, which would amount to a wrongful taking in trespass, would have the like effect in replevin. My brother JEWETT supposes that the defendants were naked bailees of the goods, and that, consequently, the form of the action was misapprehended; but I can discover nothing in the facts of the case to lead to such a conclusion.

1. As to the right of property in the goods. It is a familiar principle of the case of contract, that although a contract for

Hymann *agt.* Cook and others.

the sale of goods be complete, and binding in other respects, the property in them remains in the vendor, and they are at his risk, if any material acts remain to be done before the delivery, either to distinguish the goods or to ascertain the price thereof. If something remains to be done, as between vendor and vendee, for the purpose of ascertaining either quality, value or quantity, such as measuring, weighing, or counting out of a common parcel, there is no delivery. (*Chitty on Contracts*, 375, 6*th Am. ed.* ; *Harrison* v. *Meyer*, 6 *East*, 614; 1 *Denio*, 51.) It is insisted in this case by the counsel for the defendants, that the plaintiff bought two lots of horn-tips, which the defendants offered to deliver in bulk; but the plaintiff refused to accept such delivery, and required the lots be counted. Before the counting was completed, the defendants retracted their offer, and declined to make the delivery. If these were the facts, the judgment of the common pleas was clearly right, as no property passed to the plaintiff, something remaining to be done before the goods were delivered. But I do not so understand the evidence, nor, in my judgment, is it susceptible of such a construction. The facts are, that the defendants held themselves out to the public as manufacturers of combs, and importers of English, French, and German fancy goods. They kept a store or warehouse in the city of New-York. On the 3rd August, 1839, the plaintiff, through his agent, and in the ordinary course of trade, purchased from them, for cash, nine casks of horn-tips in bulk, at the price of $260 ; fifty dollars of which price was paid immediately, and the balance, amounting to $210, two days afterward. A bill of sale of the property, in bulk, was given by the defendants to the plaintiff's agent, and also receipts of payment of the price. The casks were in the lower part of the store of the defendants, and were pointed out to the plaintiff's agent; and after the price had been fully paid, and the receipt given, he was directed by the defendants to take the tips away. There is no evidence of an agreement to count the tips, or that the number in any way entered into the bargain, or that the value or price depended at all upon the number. Indeed,

the written evidence is conclusive that the tips were purchased, and paid for at a stipulated price in bulk; and that at the payment and receipt of the money, as between vendor and vendee, the contract was fully executed. Nothing remained to be done by the parties by way of identifying or setting apart the property. It in no part of the evidence appears that the plaintiff's agent refused to accept the delivery of the casks; but, on the other hand, the evidence is that he went to the store the day following to take them away. Although, for his own convenience, or for any other cause unconnected with the sale, this agent may have desired to count the tips on the defendant's premises before taking them away, as between vendor and vendee nothing remained to be done to consummate the agreement and pass the right to the property. It was no longer at the risk of the vendor, and had it become destroyed by fire on the premises of the defendants, the loss would have fallen on the plaintiff. The payment of the agreed price or consideration for the sale absolutely vested in him the property contracted for.

2. Was there a delivery to, and possession of the property in the plaintiff? Where a sale is *bona fide*, and for a valuable consideration, slight evidence of delivery is sufficient. (*Shumway* v. *Rutter*, 8 *Pick.* 443.) Goods are delivered when they are placed in the vendee's power, so that he may immediately remove them, and cannot be rightfully prevented from so doing. (*Smith's Mercantile Law*, 499, *and cases cited.*) Where a sale is for cash, and payment is made, the vendor is bound to deliver; and delivery may be inferred from slight circumstances. It is a rule, that where by the contract itself the vendor appropriates to the vendee specific chattels, and the latter thereby agrees to take them, and to pay the stipulated price, the very appropriation of the chattels is equivalent to delivery by the vendor, and the assent of the vendee to take the specific chattels, and to pay the specific price, is equivalent to his accepting possession. (*Chitty on Contracts*, 375.) There is no case contradicting the principle, that when a vendor of goods has ascertained and appropriated them, and the vendee has assented to such

appropriation, the property passes to the latter. (*Hilliard on Sales*, 136.) In this case, the evidence shows not only a con-tract appropriating by the defendants to the plaintiff the nine casks of horn-tips, and an assent of the latter to take them, and pay the stipulated price, but also payment by the vendee; a special direction to take possession of them on the part of the vendors, and an acceptance by the vendee. There was at least a constructive delivery by the vendors, unless I have wholly mistaken the terms of the contract and its legal effect in con-nection with the acts of the parties; and the defendants are clearly right in supposing that the evidence shows that they offered to deliver in bulk; but that the plaintiff refused to accept such delivery, and required the tips to be counted, it seems very clear that no such supposition can be fairly deduced. It is true, that after the contract was consummated by the pay-ment of the money, the vendee's agent took actual possession of the property, and with the assent of the vendors proceeded to count the tips on their premises; but there is no evidence that the counting was in any way to affect the contract of sale, or to regulate or control the price or value of the goods pur-chased. There is no intimation that any portion of the price already paid was to be refunded in the event of the tips falling short of a given or agreed number. As I look upon this mat-ter of counting, it was an act solely of the plaintiff, transpir-ing subsequently to the transfer of the property to him, and by which the defendants were not, nor could not be in any respect affected. The plaintiff had paid a sum in gross for the nine casks, and whether there was a greater or lesser number of tips could make no difference. It appears to me, therefore, to infer as a matter of law that the right of property did not pass, or that the counting of the tips was, by the terms of the con-tract, a precedent condition to the delivery and vesting of the property in the plaintiff, would be clearly erroneous.

There being a cash sale, payment made, and a constructive, if not an actual delivery of the goods, the absolute right to, and possession of them vested in the plaintiff, the effect of which absolute investment was to enable him to hold them against all

Hymann *agt.* Cook and others.

others.   His possession was either actual or constructive :
actual, if in his custody and under his immediate control; con-
structive, if having the right to reduce them to immediate pos-
session ; for a general property in a chattel always draws to it
a possession in law.   In either case he might maintain trespass
or replevin for an unlawful taking.   But I think the facts show
the plaintiff to have been in actual possession of the goods the
day following the sale, and up to the time of the alleged taking
by the defendants.   His agents had gone to the store of the
defendants, and inquired wether they could get at the casks to
count the tips and take them away.   They were told that they
must count them and take them away as soon as they could, as
the defendants had no room for them.   They set about count-
ing, emptying the contents of each cask, separately, upon the
floor, and counting the tips back into it.   They had emptied
and counted four or five of the nine casks in this way, and were
still engaged when the defendants interfered, and would not
let them take them away ; setting up the unfounded pretence
that they had not paid for them, and refusing to suffer them to
be taken away solely upon that ground.   The facts show the
plaintiff to have been in actual possession of the property sub-
sequent to the sale and prior to and cotemporaneous with
the interference of the defendants.   It is true, that it was on
the _ premises of the defendants ; but the plaintiff's agents
were there holding it by their express assent.   Indeed, in the
absence of any proof of assent, I think the plaintiff had an un-
doubted right to enter to possess himself of the property and
take it away ; for in a sale of goods, absolute and complete, in
a store or warehouse, the legal right of the purchaser to enter,
possess himself of them, and take them away, is implied, as an
incident of such sale.   In this case, however, there was an
express license by the defendants that actual possession might
be taken on their premises, and such license being given, if
subsequently, without any abuse of it by the plaintiff, the de-
fendants exercised an unlawful dominion over the property, I
cannot think that they were the less trespassers.   I cannot adopt
the doctrine, that an individual may not, even on his own

premises, tortiously take the property of another, when that other holds the actual possession on such premises of the specific property with his assent.

The judge, in non-suiting the plaintiff, admitted that he had given evidence of a wrongful detention. If by the terms of the contract, the property did not absolutely vest in the plaintiff, but something remained to be done by the parties as a precedent condition to the delivery and sale, the legal possession continued in the defendants; and such possession being legally in them, there could be no wrongful detention; nor could they, as one of my brethren supposes, be constituted bailees for the plaintiff. A wrongful detention, as against the plaintiff, supposes that he is entitled to the possession of the goods, and that they are unjustly detained, though the original possession of the defendants was lawful. If, as the counsel for the defendants insist, the property had not absolutely vested in the plaintiff, but the contract was still executory, there could be no wrongful detention, nor could replevin in the *detinet* be maintained. The admission, therefore, that there was evidence of a wrongful detention in effect admitted the title to the property and the right of possession to be in the plaintiff. So also, if the property in the goods had not absolutely vested in him by sale and delivery, the defendants could in no sense be considered as his bailees.

3. Was there, on the part of the defendants, such an interference with, or unlawful exercise of dominion over the property as to constitute them trespassers? For if their acts were such, as in judgment of law to make them trespassers, replevin in the *cepit* will lie against them. The defendants insist, that if the property in the goods passed to the plaintiff, trover was the proper remedy after demand and refusal. Why, if I am right in my conclusions that the title was in the plaintiff, and that there was a delivery and an actual or constructive possession, any exercise or claim of dominion, though by mere words, the defendants having the goods within their power, amounts to such a taking as to warrant an action of trespass. (23 *Wend. R.* 466.) Our own courts have repeatedly decided that a mere claim of dominion, an intention being indicated to interfere

with the goods, under pretence of any right or authority, amounts to a constructive trespass. An actual manucaption of goods is not necessary to constitute a tortious taking. This has often been held. To maintain trespass or replevin evidence of an actual, forcible dispossession of the plaintiff is not necessary; any unlawful interference with his property by which he is damnified is sufficient to maintain either action. (10 *Wend. R.* 350.) The evidence in this case shows an exercise of dominion over and interference with the property by the defendants; not as bailies for the plaintiff, nor for the reason that the sale had not been fully consummated. The plaintiff's agent, who had the property in custody, distinctly states that they thus interfered, and would not suffer him to take it away, assuming a right to hold and an absolute exercise of dominion over it. And they thus continued their claim of dominion up to the replevy. It appears to me, therefore, that there was such a wrongful taking shown as amounted to a trespass; and if so, the form of action was not misapprehended. But if I am wrong in relation to the strength or degree of evidence on this point, the question should have been submitted to the jury. I am unwilling, under the circumstances of this case, to conclude, as is contended, that because the property had not, after the sale, been actually removed from the premises of the defendants, they may exercise an absolute control and dominion over it, in opposition to, and in exclusion of the rights of the plaintiff, and yet, that trespass or replevin will not lie against them. If this be so, the law will, in numerous instances, work manifest injustice.

I am of the opinion that the judge erred in non-suiting the plaintiff upon the assumption that there was no evidence of a wrongful taking. The property being in the plaintiff, the question, whether there had been a tortious taking, turned upon matters of fact for the jury to find from the evidence. That evidence should have been submitted to them.

DECISION.—Judgment affirmed.

For affirmance, JEWETT, Ch. J., BRONSON, JONES, RUGGLES and GARDINER. For reversal, WRIGHT, JOHNSON and GRAY.

Hymann *agt.* Cook and others.

NOTE.—JEWETT, Ch. J., (as to the record,) *held*, that the result of the authorities was, that the court ought not to give judgment of reversal, if there be no error in law, notwithstanding *in nullo est erratum* is not put in; and though the defendants in error would have the same advantage indirectly, as if they had pleaded that there was no error; which would not be permitted, with the plea of the statute of limitations. The general rule is, that the court *ex officio* must give the proper judgment according to the right appearing upon the whole record.

*Held*, (on the merits,) that the defendants, at the time of refusal to let the plaintiff have the goods, had the possession thereof as *bailees*, by the authority of the plaintiff; and could not by any wrongful subsequent act, as by converting the same to their own use, have made themselves trespassers *ab initio ;* and replevin for an unlawful *taking* could not be sustained.

It was a matter within the discretion of the court to allow the defendants to waive their election to have an assessment of damages, and take judgment for a return.

BRONSON, J., (as to the record,) was, after another argument, confirmed in the opinion which he expressed when the case was before the supreme court, on motion (2 *Denio*, 201) that the verdict only settled that the plaintiff was not barred of his writ of error; and left the question still open, whether in truth there was any error in the judgment of the common pleas.

Did not recollect of any case where the judgment is either affirmed or reversed, without looking into the record, except where judgment passed by default in the appellate court; and where error in fact is assigned by and is found or adjudged in favor of the plaintiff.

*Held*, (on the merits,) that it was clear upon the evidence that the property was *never* out of the *possession* of the vendors, and consequently they could not have taken it from the plaintiff. At the common law replevin will only lie where trespass might have been maintained; and although our statute authorizes the action of replevin for an unlawful detention, as well as for an unlawful taking, the distinction between the two cases is to be kept up in the writ and pleadings.

And further *held*, that in this case the *title* of the property *never passed out of the vendors.* Upon the evidence it was, undoubtedly, a sale of some *specified quantity* of tips, which quantity was to be ascertained by counting, and the counting not having been completed, the title remained in the vendors.

WRIGHT, J., (*dissenting*, discussed only the merits,) *held*, that the evidence showed that the plaintiff, through his agent, and in the ordinary course of trade, purchased from the defendants, for cash, nine casks of horn-tips *in 'bulk ;* the amount was paid, and the defendants gave a bill of sale of the property in bulk; and also receipts of payment of the price. After the price had been fully paid and the receipts given, the plaintiff was directed by the defendants to take the tips away. There was no evidence of an agreement to count the tips, or that the number in any way entered into the bargain, or that the value or price depended at all upon the number. That the written evidence was conclusive that the tips were purchased and paid for at a stipulated price in bulk; and that at the payment and receipt of the money, as between vendor and vendee, the contract was fully *executed.* Nothing remaining to be done to consummate the

agreement, and pass the rights of the property, it was no longer at the risk of the vendors. The payment of the agreed price or consideration for the sale, absolutely *vested* in the plaintiff the property contracted for.

Also *held*, that the evidence showed, at least, a constructive, if not an actual *delivery* of the property to the plaintiff; and that the plaintiff was in the actual possession of it, subsequent to the sale and prior to and cotemporaneous with the interference of the defendants.

It made no difference that the property was on the defendants' premises; the plaintiff's agent was there holding it by the express assent and license of the defendants. And in the absence of any proof of assent, the plaintiff would have had a right to enter and possess himself of the property and take it away.

The admission that there was evidence of a wrongful *detention* in effect, admitted the title to the property, and the right of possession to be in the plaintiff. If the title to the property was not absolutely vested in the plaintiff, and the contract remained executory, there could be no wrongful detention by the defendants.

If, therefore, the title of the property was in the plaintiff, and there was a delivery, and an actual or constructive possession, any exercise or claim of dominion by the defendants, though by mere words, the defendants having the goods within their power, amounts to such a taking as to warrant an action of *trespass*, and consequently replevin in the *cepit*.

Also *held*, that the evidence showed such an exercise of dominion over and interference with the property by the defendants, not as bailees for the plaintiff, nor for the reason that the sale had not been fully consummated, as constituted a wrongful taking. At least it was a question for the jury; and the plaintiff should not have been non-suited.